HENRY T. STOTLER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Stotler v. Commissioner
Docket Nos. 26933-83, 27522-83, 31887-83, 31889-83, 31909-83, 31914-83, 31985-83, 32016-83, 32281-83, 32282-83.
United States Tax Court
T.C. Memo 1987-275; 1987 Tax Ct. Memo LEXIS 275; 53 T.C.M. (CCH) 973; T.C.M. (RIA) 87275; June 4, 1987. Charles H. Page and Laurence Horan, for the petitioners. Patricia A. Golembiewski and Rebecca T. Hill, for the respondent. WRIGHT
MEMORANDUM FINDING OF FACT AND OPINION WRIGHT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Petitioners
1979
1980
1981
Henry T. Stotler
$1,011
a $13,058
Laurence P. and
Jean A. Horan
$18,971
31,728
2,413
Frederick M. and
Susan S. Pownall
14,152
19,117
8,026
Bruce W. and
Marsia E. Hyman
14,970
11,656
Douglas E. and
Roberta Chappell
15,290
Jay M. and Kip J.
Hudson
4,378
6,107
1,609
Charles R. and
Carol J. Keller
12,785
13,253
19,822
Joseph M., Jr. and
Ruth E. Tully
10,145
9,067
10,619
Theodore C. and
Joan B. Hooker
13,732
14,350
13,896
Charles H. and
Caroline R. Page
15,041
28,436
b 10,612
*278 With the exception of the residential energy credit claimed by petitioners Page, all deficiencies result from respondent's disallowance of petitioners' deductions claimed with respect to a charitable contribution of a scenic easement on 1,584 acres of land in Monterey County, California. The issues for consideration are: (1) whether the scenic easement granted by petitioners to Monterey County on December 28, 1979, qualifies for deduction under section 170(f)(3)(B)(iii); [2] (2) if so, what was the value of the property both before and after the easement was granted; and (3) whether petitioners are liable for additions to tax under section 6621(c)(3)(A)(i). [3]
*279 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. At the time the petitions in this case were filed, all petitioners resided in California. In 1977, petitioner Charles H. Page entered into negotiations with the Pebble Beach Corporation for the purchase of a 1,584-acre parcel of real property in the Cachagua area of the Carmel Valley ("the Cachagua property"). The subject of these negotiations was the purchase price of the Cachagua property. On March 2, 1978, petitioners Charles H. and Caroline R. Page and petitioner Henry T. Stotler, together with two other individuals who are not petitioners in this case, entered into an option agreement with the Pebble Beach Corporation for the purchase of the Cachagua property. The option was exercised by an agreement for sale of real property dated May 16, 1978, and signed by 19 individuals, 18 of whom are petitioners in this case. The purchase price of the Cachagua property was $315,000. The purchasers made a cash down payment in the amount of $70,000 and the $10,000 consideration for the option was *280 applied to the purchase price. On June 20, 1978, the purchasers executed a promissory note in the amount of $235,000 payable to the Pebble Beach Corporation. The promissory note was secured by a deed of trust on the Cachagua property. On June 27, 1978, the purchasers executed a co-tenancy agreement with respect to the Cachagua property. The purpose of this agreement was to provide a waiver by the purchasers, as co-tenants, of their rights to partition the Cachagua property under section 872.010 et seq., California Code of Civil Procedure (West 1980), to establish a method of handling income and expenses arising out of the ownership of the property and to provide for a right of first refusal in the event that one of the co-tenants decided to sell their interest in said property. Paragraph II of this agreement provided, in part, as follows: It is understood and agreed that the parties will purchase and hold the aforesaid property to preserve it in its natural state and each agrees not to sell, transfer, or otherwise dispose of his undivided interest except in accordance with this agreement. The property may be sold or divided only upon the written agreement of persons holding *281 a majority interest in the property, and such sale or division shall be binding upon the remaining parties, who shall execute all documents reasonably necessary to complete such transaction. At the time the Cachagua property was purchased in June, 1978, it was not for sale on the open market, had not been advertised, and no brokers in the Carmel Valley were aware that the property was for sale. On December 6, 1979, the purchasers of the property executed a deed entitled "Conservation and Scenic Easement Deed." The deed conveyed to the County of Monterey a scenic easement in the Cachagua property and contained restrictions on the owners' use of the property. The restrictions provided that no structures could be placed or erected on the property; that no advertising could be located on or within the property; that no vegetation, except vegetation indigenous to the area, could be planted on the property; and that the general topography of the landscape would be maintained in its present condition. The following rights were reserved by the owners: the right to prune, trim and maintain the plant and tree life on the property; the right to possess, use and enjoy the land in a manner *282 not inconsistent with the restrictions imposed and the right to use, maintain, repair and improve the existing stone cabin on the property. The deed further provided: If all or any portion of the land described in Exhibit "A" is sought to be condemned for public use, this easement shall terminate as of the time of the filing of any complaint in condemnation as to the land or any portion thereof or any right therein sought to be taken for public use and the owners shall be entitled to such compensation for the taking as the owners would have been entitled to had the land not been burdened by this easement. The easement was granted "to have and to hold unto the said County of Monterey, its successors and assigns forever." The board of supervisors of Monterey County adopted a resolution accepting the scenic easement for the Cachagua property on December 18, 1979, and the easement was recorded on December 28, 1979. The Cachagua property is located within the Cachagua area of the unincorporated Carmel Valley. Carmel Valley is a scenic valley with gently rolling to steep hills on both the north and south sides. This valley has become a resort area with some development that *283 attracts tourists and retired people who have constructed permanent residences within the valley. The Carmel River and the San Clemente Reservoir serve as a portion of the boundary of the western edge of the property. The Carmel River traverses the property in an east-west direction. There is access to approximately 2 miles of the Carmel River along the westerly boundary of the subject property and along the portion of the river which traverses the property. The south boundary of the property shares a common boundary with the Los Padres National Forest. The Cachagua property is approximately 15 miles southeast of the City of Carmel and 1 mile south of the Carmel Valley Road, which is the major east-west thoroughfare in the area. The neighborhood surrounding the Cachagua property is largely undeveloped and consists primarily of unimproved land, ranches and scattered single-family residences. The nearest paved right-of-way lies approximately 2,500 feet east of the subject property. The topography in the area is mostly rolling and steep land with some level land on the fringes of the Monterey Peninsula and within the valley floors. The Cachagua property lies outside of the service *284 areas of local water companies. Outside of these service areas, water is supplied by private wells and individual septic tanks are used for sanitary sewage disposal. Electric power is supplied by Pacific Gas and Electric Company. Gas is provided by means of butane storage tanks. During the years prior to the date of the contribution of the scenic easement at issue herein, local residents and governmental agencies endeavored to discourage rapid growth and to limit commercial development within the Carmel Valley. Topographical features and the lack of water supply helped in limiting this development. In August, 1977, the Monterey County board of supervisors adopted the Cachagua master plan. The goal of the plan was to ensure that the rural character of the Cachagua area would be retained, while also retaining the individual rights of property owners and providing for reasonable development of the area consistent with its character. The policies of the plan provided, in part, that development should be limited to low overall densities which could be achieved through establishing relatively large minimum lot sizes and permitting cluster developments when topography and other conditions *285 warranted. The policies also provide that lands draining into water storage reservoirs be considered primary watershed and development of those areas be carefully considered. Lands with a prevailing cross-slope in excess of 30 percent should be recognized as having severely limited development potential and should be planned to support low density development. Projects which encompass hazardous, steep, and environmentally fragile or visually sensitive areas should be required to place these areas in scenic easements as a condition of approval. Areas that constitute the visual backdrop and help establish the rural character of Cachagua should be protected from the encroachment of incompatible uses. At the time the scenic easement was donated, the Cachagua property was zoned N-10 which provided a density requirement of 10 acres per unit. The Cachagua master plan and the zoning ordinance followed the general policy favoring cluster development on such rural properties in Monterey County. The Cachagua property is an important natural wildlife habitat for deer, wild pig, bobcat, coyote, grey fox, mountain lion and black bear. It also serves as a habitat for 115 to 135 different *286 species of birds, including ban-tail pigeons, mourning doves, California quail, and the great blue heron. Further, the portion of the Carmel River which traverses the property is an important spawning area for steelhead salmon and trout. The property also contains significant stands of trees including douglas fir, madrone, and bay laurel, as well as unique examples of white oak, black oak, and California live oak. The property provides scenic vistas from public roads, public trails in the Los Padres National Forest and from residential developments in the surrounding area. Prior to the granting of the scenic easement, the purchasers of the property requested Bestor Engineering, Inc., a civil engineering land development firm, to prepare a noncontroversial development plan ("the Bestor plan") for the Cachagua property. This plan was to be used by an appraiser to illustrate the potential value of the Cachagua property. The Bestor plan proposed areas of development concentration on the Cachagua property. The principal area for development, under the plan, is approximately 70 acres of lower meadow area with 2,500 feet of frontage along the Carmel River and San Clemente Reservoir. *287 The plan proposed that 51 lots be created on 58.5 acres within the lower meadow area, and provided for a 4-acre community recreation site and 7.5 acres of road rights-of-way. The plan also proposed the development of 5 acres in the upper meadow area of the property along the access road at the entrance. Five lots were proposed for this area. Each of the areas which the Bestor plan proposed to develop had cross-slopes of less than 30 percent. The total density of the development plan was one unit per 28.29 acres, which is approximately one-third of the density permitted under present zoning. None of the proposed sites were smaller than 1 acre, which was the minimum lot size required by the county policy with respect to septic tanks. In December of 1979, a plan such as the Bestor plan to develop the Cachagua property would probably have received approval from Monterey County. As an alternative to developing the property through the major subdivision process, as proposed by the Bestor plan, the owners could have used the minor subdivision process. A minor subdivision would have been approved if the property had been divided by the owners into four parcels and a parcel map showing *288 that each of the four parcels had legal access was recorded. In order to divide the property into four parcels, it would not have been necessary to install any improvements or comply with any governmental regulations other than the recording of the parcel map showing access. After the property was so divided, the owners could have sold each of the parcels for further division into four additional parcels which could be resold and similarly divided into parcels as small as 10 acres by the process of recording a parcel map showing legal access to each parcel. This process is known as "4 X 4ing." The purchasers engaged the services of Floyd D. Clevenger, a professional appraiser, to value the property for purposes of determining the income tax deduction to be taken by each property owner in connection with the contribution. Mr. Clevenger holds an M.A.I. designation, and is a senior member of the American Society of Appraisers and holds a senior real estate property designation with the Society of Real Estate Appraisers. He is also a member of the American Institute of Real Estate Appraisers. He had many years of appraisal experience in Monterey County and has appraised approximately *289 75 properties in the county in the last 15 through 17 years. Mr. Clevenger has appraised 6 to 10 different Carmel Valley properties. At the time petitioners employed Mr. Clevenger, they requested a conservative appraisal. Mr. Clevenger determined that based on the location of the property, its zoning, terrain features, soil type, development trends in the area and other features, the highest and best use for the property would be subdivision and development of singlefamily residences to a maximum allowable density of 158 units. The development could best be accomplished through the use of cluster or planned unit development. Because of the large percentage of steep land on the property, the total development allowed would probably be less than the maximum density. Mr. Clevenger valued the subject property at its fair market value both before and after the scenic easement was contributed. In valuing the property, he considered its development potential and analyzed other property transactions in the area in order to obtain market data. He further considered the cost of implementing the Bestor plan as a check against the market data approach. A total of 22 transactions were *290 analyzed in determining the value of the Cachagua property. The transactions which Mr. Clevenger considered of primary importance in his report were designated sale No. 1, sale No. 2, and sale No. 7. Sale No. 1, on January 24, 1979, was a total of 382.321 acres at a price of $500,000 or a per acre price of $1,471.28. Mr. Clevenger considered this property to be 25 percent superior to the subject property because of its topography; 15 percent superior because of its frontage access; and 5 percent superior by its potential development density. He also made a small upward adjustment for appreciation due to the time of the sale. Sale No. 2 took place on June 10, 1976, and consisted of 289 acres which were sold for $356,000 or a per acre price of $1,232. It was subsequently subdivided into 23 sites averaging 10 acres per site. Sales of finished lots from the subdivision ranged from $160,000 to $197,500 each. Mr. Clevenger estimated this property to be 25 percent superior in topography; 15 percent superior by frontage access; and 5 percent superior by development density. He also applied a 4 percent adjustment due to the time of the sale. Sale No. 7 took place on May 27, 1977, and *291 consisted of 601 acres for a price of $300,000 or a per acre price of $499. Mr. Clevenger considered this property to be 15 percent inferior by topography; 20 percent inferior by potential development density; and 10 percent superior by road frontage and access. He further applied an adjustment for time of 4 percent. After the initial sale, four 45-acre parcels and one 148-acre parcel had been sold at prices from $1,988 per acre to $1,203 per acre. After considering these sales, Mr. Clevenger determined that the total value of the subject property including land and improvements, using the market data approach, was $1,165,000 prior to the contribution of the scenic easement. He estimated the value of the property subsequent to the contribution of the easement to be $100,000. Mr. Clevenger also considered the effect of implementing the Bestor plan and concluded that average sale price of a lot within the subject property in its finished lot state would be $72,000. After deducting estimated development and sales costs, he estimated that the value of the property, using projected subdivision development as a check on the market data approach, would be $1,153,000. He concluded, *292 however, that the market data approach had greater validity and presented better evidence of what was occurring in the market at that time. Therefore, Mr. Clevenger concluded that the total value estimate of land and improvements prior to the contribution of the scenic easement was $1,165,000. Respondent retained Robert Lea of Lea Associates, Inc., to appraise the Cachagua property. Mr. Lea is a member of several professional organizations, including the American Institute of Real Estate Appraisers, and has an M.A.I. designation. He is qualified as an expert witness in real estate matters in several courts, including the Tax Court. Mr. Lea has taught courses in real estate appraisal. Although he had significant experience in appraising all types of real property, he had little or no experience in Monterey County prior to his appraisal of the subject property. Mr. Lea has appraised two other parcels of real property in Monterey County which did not assist him in the appraisal of the subject property. He had no personal familiarity with the market area of the Cachagua property. Mr. Lea spent two days in Monterey County while doing the appraisal of the Cachagua property, and during *293 this time he also appraised a tire manufacturing plant in Salinas, a city 17 miles from the subject property. The only contact Mr. Lea had with the Cachagua area was the two days he spent in the Carmel Valley doing his appraisal. Mr. Lea was assisted by Craig Tilson who, at Mr. Lea's request, collected the data upon which respondent's appraisal is based. Mr. Tilson had limited appraisal experience and had never done any work in Carmel Valley prior to this assignment. Mr. Lea used the market data approach in valuing the Cachagua property. In reaching his conclusions, he analyzed eight sales which he considered comparable and compared them to the Cachagua property. Mr. Lea considered the following factors: time of sale, general location, surroundings, access, parcel size and shape, topography, potential development density and utility availability. Mr. Lea determined, after considering the Cachagua master plan, that the highest and best use of the subject property was for low density, single-family residential development. Mr. Lea considered eight comparable sales in making his determination as to the value of the property. His sales Nos. 1, 2, and 6 were identical to Mr. *294 Clevenger's sales Nos. 1, 2, and 7, respectively. Mr. Lea considered that sale No. 1 was superior to the Cachagua property on an overall basis, although it was slightly inferior in terms of date of sale. He also considered sale No. 2 superior to the subject property. Mr. Lea's sale No. 6, which was identical to Mr. Clevenger's sale No. 7, was also considered superior to the Cachagua property on an overall basis. Mr. Lea used only the market data approach in valuing the property, and did not consider potential development as a check on this approach. He determinated that the fair market value of the property on December 28, 1979, was $475,000. He further concluded that after the contribution of the scenic easement, the fair market value of the property was $47,500. Mr. Lea's appraisal was completed March 29, 1985, which was approximately 3 1/2 weeks prior to trial in this case. In making his appraisal, Mr. Lea relied on the purchase of the subject property by petitioners as one of his comparable sales. Mr. Clevenger did not consider the purchase of the subject property because the purchase was not an open market transaction. Mr. Lea valued the Cachagua property as a single *295 parcel, without considering the ability of the owners to utilize the minor subdivision process to develop the property. He further relied on sales which were not in the Cachagua planning area or the upper Carmel Valley market area. Mr. Lea was unaware of a development approximately 200 yards from the Cachagua property on the Cachagua Road. He was also unaware of a 40-foot easement for high tension lines and the existence of high tension wires and towers along the entrance to property he used as a comparable sale, the lack of access to a major portion of this property and the lack of legal access to a public road on the date of the sale which he considered comparable. Subsequent to the date petitioners purchased the property, the Monterey Peninsula Water Management District was created. At the time petitioners contributed the scenic easement to Monterey County, the Water Management District was considering enlarging the San Clemente Dam, on which petitioners' property fronts. As of the date of the contribution of the scenic easement, it was speculative whether the voters of the Water Management District would reject the District's proposal to enlarge the dam. As of the date of *296 trial in this case, the Water Management District was still actively evaluating plans for the enlargement of the San Clemente Dam but was also considering other alternatives. If the proposal for the enlargement of the dam were implemented the enlargement would have inundated a portion of the Cachagua property to the 640-foot elevation which would have affected 7 acres of the lower meadow area. As of the date of trial, the Water Management District was evaluating the acquisition of all lands lying under an elevation of 680 feet in the reservoir pool which would affect 31 acres of the Cachagua property. On their tax returns for 1979, petitioners claimed charitable contribution deductions based on the reduction in the fair market value of the property after the contribution of the scenic easement according to Mr. Clevenger's appraisal. By notices of deficiency, respondent disallowed these deductions in their entirety. OPINION The first issue for consideration is whether petitioners made a charitable contribution which is deductible pursuant to section 170 for taxable year 1979. Petitioners bear the burden of proof with respect to this issue. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). *297 Section 170(a) provides, in general, that a deduction is allowed for any charitable contribution the payment of which is made within the taxable year. Sec. 170(a)(1). Section 170(f)(3)(A) limits the amount of a deduction that may be taken in the case of a contribution (not made by a transfer in trust) of an interest in property which is less than the taxpayer's entire interest in such property. The Tax Reform Act of 1976 added clauses 170(f)(3)(B)(iii) and (iv), as well as subsection 170(f)(3)(C). These additions excepted from the general rule denying deductions in the case of contributions of partial interests in property: (iii) a lease on, option to purchase, or easement with respect to real property of not less than 30 years' duration granted to an organization described in subsection (b)(1)(A) exclusively for conservation purposes, or (iv) a remainder interest in real property which is granted to an organization described in subsection (b)(1)(A) exclusively for conservation purposes. (C) Conservation purposes defined. -- For purposes of subparagraph (B), the term "conservation purposes" means -- (i) the preservation of land areas for public outdoor recreation or education, *298 or scenic enjoyment; (ii) the preservation of historically important land areas or structures; or (iii) the protection of natural or environmental systems. Section 170(f)(3), as amended by section 2124(e), Tax Reform Act of 1976, Pub.L. 94-455, 90 Stat. 1919. Section 170(f)(3)(B)(iii) was amended in 1977 to provide that a lease on, option to purchase, or easement with respect to real property must be granted in perpetuity in order to qualify for a charitable contribution deduction. At the same time, Congress extended the effective date of the 1976 amendments to contributions or transfers made after June 13, 1977, and before June 14, 1981. Act of May 23, 1977, Pub.L. 95-30, sec. 309, 91 Stat. 154. [4] Thus, the scenic easement contributed by petitioners will qualify for a charitable contribution deduction if it was made, in perpetuity, to an organization described in section 170(b)(1)(A). *299 The parties do not dispute that the County of Monterey is a qualified donee organization under section 170(b)(1)(A)(v) and (c)(1). Respondent argues, however, that on the date of gift, there was a significant likelihood that the Cachagua property would revert to petitioners by virtue of condemnation of the property. Respondent premises his argument on a paragraph contained in the deed conveying the scenic easement to the County of Monterey, which states: If all or any portion of the land * * * is sought to be condemned for public use, this easement shall terminate as of the time of the filing of any complaint in condemnation as to the land or any portion thereof or any right therein sought to be taken for public use and the owner shall be entitled to such compensation for the taking as the owners would have been entitled to had the land not been burdened by this easement. The right to compensation described in this paragraph is taken directly from section 51095 of the California Government Code. Cal. Gov. Code sec. 51095 (West, 1981). Respondent maintains that the possibility of enlargement of the San Clemente Dam, considered together with this paragraph *300 in the deed, constitutes a possibility, which is not so remote as to be negligible, that the County of Monterey's interest in the property would be defeated pursuant to section 1.170A-1(e), Income Tax Regs. That section provides, in pertinent part, If an interest in property passes to, or is vested in, charity on the date of the gift and the interest would be defeated by the subsequent performance of some act or the happening of some event, the possibility of occurrence of which appears on the date of the gift to be so remote as to be negligible, the deduction is allowable. * * * For the following reasons, we disagree with respondent's contentions. Respondent's argument is based on the premise that a portion of the Cachagua property would be condemned for the enlargement of the San Clemente Dam. While the facts indicate that the enlargement of the dam has been considered since 1977, plans for such enlargement have never been approved and other alternatives have been considered. The plans for the enlargement of the San Clemente Dam which were being considered at the time of the contribution of the scenic easement would have inundated the property to the 640-foot level. While *301 respondent argues that the expansion of the dam would cause the failure of the easement due to condemnation of the property, respondent fails to note that the inundation of the property to the 640-foot level would require condemnation of 7 acres out of a total of 1,584 acres subject to the easement. The statute specifically provides for compensation if a portion of the property is taken. Sec. 51095 Cal. Gov. Code (West 1981). We cannot agree with respondent that the never-implemented possibility of the enlargement of a dam which would result in the condemnation of less than one-half of one percent of the property at issue herein should cause the denial of the deduction for the contribution of the scenic easement over the entire property. Further, respondent's interpretation of section 51095, California Government Code, is incorrect. Respondent argues that this provision, which is contained in the deed conveying the easement, provides for a failure of the easement on condemnation of the underlying property. The statute provides, however, that the owner of the property shall be entitled to compensation as if the land had not been burdened by the easement at the time of condemnation. *302 Respondent argues, on brief, "on the date of the recording of the deed, there existed a significant likelihood that the Cachagua property would revert to petitioners by virtue of condemnation of the property." Respondent fails to take into account, however, that if the land underlying the scenic easement were condemned, the land, as well as the easement, would belong to the County of Monterey. Petitioners merely retained the right to be compensated for the underlying land in the event that it was condemned by the county. Thus, the land would never revert to petitioners. Respondent correctly asserts that petitioners could have waived the protection of section 51095 of the California Government Code in the deed rather than recite the operative language of the statute. Respondent again fails to note, however, that the effect of a waiver of this position would be to deny petitioners compensation in the event of condemnation of the property and not, as respondent apparently believes, to avoid the possibility of condemnation altogether. Every real property interest, including open-space easements, is subject to condemnation under the power of eminent domain pursuant to the California *303 Constitution, article I, section 19. The fact that the owners of the property are entitled to compensation on the exercise of the power of eminent domain by a public agency is irrelevant to the possibility of the exercise of such power. Respondent's reliance on petitioners' failure to waive the provisions of section 51095, California Government Code, is therefore misplaced. Further, petitioners argue that the waiver of the right to compensation on condemnation of the property would lead to a greater probability that the property would, in fact, be condemned. If petitioners had not reserved the right to compensation on the condemnation of the property pursuant to section 51095 of the California Government Code, the amount which would have to be expended by the county to acquire the property needed to expand the dam would be the fair market value of the property subject to the scenic easement. Thus, given the choice between the possibility of enlarging the San Clemente Dam which would require purchasing a portion of the Cachagua property or undertaking an alternative project which would require purchasing other property at its fair market value, the ability to purchase the Cachagua *304 property at its depressed value would result in a greater likelihood of the condemnation of a portion of the property. By reserving the right to compensation at the fair market value of the property without regard to the scenic easement, petitioners lessen the probability that such property would be condemned in order to expand the San Clemente Dam. Respondent next contends that the easement granted by petitioners to Monterey County was not in perpetuity because petitioners retained the right to petition the county to abandon the easement. Respondent's argument is based on the provisions of section 51093 of the California Government Code, which provides in pertinent part: (a) The landowner may petition the governing body of the county or city for abandonment of any open-space easement or in the case of an open-space easement granted to a nonprofit organization pursuant to this chapter, for approval of abandonment by such organization, as to all of the subject land. The governing body may approve the abandonment of an open-space easement only if, by resolution, it finds: (1) That no public purpose described in Section 51084 will be served by keeping the land as open space; and
*305 (2) That the abandonment is not inconsistent with the purposes of this chapter; and (3) That the abandonment is consistent with the local general plan; and (4) That the abandonment is necessary to avoid a substantial financial hardship to the landowner due to involuntary factors unique to him. No resolution abandoning an open-space easement, or approving the abandonment of an open-space easement granted to a nonprofit organization pursuant to this chapter, shall be finally adopted until the matter has been referred to the county or city planning commission, the commission has held a public hearing thereon and furnished a report on the matter to the governing body stating whether the abandonment is consistent with the local general plan and the governing body has held at least one public hearing thereon after giving 30 days' notice thereof by publication in accordance with Section 6061 of the Government Code, and by posting notice on the land. Cal. Gov. Code sec. 51093 (West 1981). Subsequent to the contribution of the scenic easement, the property tax assessment on the Cachagua property was reduced by nearly 90 percent. Respondent contends, therefore, *306 that a need for increased revenues could cause the county to abandon the easement and thereby collect increased property taxes on the value of the unincumbered property. Respondent fails to consider, however, that the California Constitution was amended in 1978 to provide that real property cannot be taxed at a rate in excess of one percent of its value. The amount by which the assessed value of the property can be increased annually is limited to the inflation rate or two percent of the value of the property, whichever is less, unless there is a change in the ownership of the property. California Constitution, article XIII. Even if the county were to abandon the easement, the rate at which the Cachagua property is taxed cannot exceed one percent of the purchase price of the property plus one percent of any increase in value, not to exceed two percent of the value of the property per year. Further, under section 51093 of the California Government Code, the county can approve the abandonment of an easement only if it finds that no public purpose will be served by keeping the land as open space. Among the public purposes enumerated in section 51084 of the California Government *307 Code, for preserving land as open space are the scenic value of the property, its value as a watershed or as a wildlife preserve. Cal. Gov. Code sec. 51084 (West 1981). Respondent does not dispute that the Cachagua property has significant scenic value, has considerable importance to Monterey County as a watershed area, and provides a high-qualify wildlife habitat the preservation of which provides a public benefit. In fact, respondent introduced considerable evidence supporting these findings. Therefore, we conclude that the possibility of the abandonment of the easement by Monterey County in order to increase tax revenues is so remote as to be negligible. Respondent further argues that petitioners could petition the County of Monterey to abandon the easement in order to develop the property, and that the attraction of increased revenues from property taxes on a development could motivate the county to abandon the easement. As noted above, however, in order for the easement to be abandoned, the county must find that no public purpose would be served by keeping the land as open space. In light of the significance of the Cachagua property as a wildlife *308 habitat, a primary watershed and a scenic area, the county could not find that no public purpose would be served by the abandonment of the easement under section 51093 of the California Government Code. This argument is, therefore, without merit. Respondent further notes that petitioners could have waived their right to petition the county for abandonment of the easement and that their failure to do so requires the finding that the easement was not granted in perpetuity. The decision to abandon an easement, however, does not rest with petitioners, but with the donee of the easement, and said donee is subject to the provisions of section 51093 of the California Government Code. As noted above, the County of Monterey is not free to abandon the easement absent of finding that no public purpose will be served by keeping the land as open space. In light of our findings concerning the scenic value of the land, and its value as a wildlife habitat and primary watershed, the possibility that no public purpose would be served is so remote as to be negligible. Finally, respondent notes that during the 8 or 10 years prior to trial in this case, grantors of scenic easements to Monterey *309 County petitioned the county for abandonment of said scenic easements. In making this contention, respondent ignores the testimony of William Peters, who served as a member of the Monterey County planning commission from 1976 until 1980 and was a member of the Monterey County board of supervisors from January 1981 until January 1985. Mr. Peters stated that he had been personally involved in all petitions for abandonment of easements during the 8 or 10 years prior to trial and that the only circumstances in which an easement had been abandoned involved the improper location of a drainage ditch or the amendment of an easement, which had been arbitrarily drawn, to provide a better location for a developable lot. Based on this testimony, we disagree with respondent's statement that "donors of scenic easements may seek abandonment is not merely an idea without a basis in reality." In arguing that the possibility of the failure of the scenic easement is not so remote as to be negligible pursuant to section 1.170A-1(e), Income Tax Regs., respondent cites several cases which have interpreted the same phrase as it appears in section 20.2055-2(b), Estate Tax Regs. While respondent correctly *310 asserts that the interpretation of the regulatory language contained in these cases may be instructive in income tax cases ( Briggs v. Commissioner,72 T.C. 646, 657 (1979), affd. without opinion 665 F.2d 1051 (9th Cir. 1981)), none of the cited cases supports respondent's argument herein. Each of the cases on which respondent relies disallowed a charitable contribution deduction where it was shown that an event which was not so remote as to be negligible could cause the failure of the charitable gift. United States v. Dean,224 F.2d 26, 29 (1st Cir. 1955); Estate of Woodworth v. Commissioner,47 T.C. 193, 196 (1966); Briggs v. Commissioner,supra. In each of these cases, the condition which would cause the failure of the gift was imposed by the grantor. In the instant case, however, the event which respondent contends would cause the failure of the easement is the exercise of the constitutional power of eminent domain by the County of Monterey under the Fifth Amendment to the United States Constitution and article I, section 19 of the California Constitution. Respondent requests that we find that *311 the ability of a public agency to exercise its power of eminent domain is sufficient to disallow a charitable contribution deduction on the contribution of an easement unless the provisions of section 51095 of the California Government Code are waived. As noted above, however, these provisions are compensatory only and a waiver thereof would not preclude the possibility of condemnation. In fact, such a waiver could encourage a public agency to acquire the property through eminent domain because such property could be acquired at its depressed value. The finding respondent requests would result in the denial of all charitable contribution deductions for scenic easements absent a waiver of the right to compensation on condemnation. This we refuse to do. Therefore, we hold that petitioners are entitled to charitable contribution deductions based on the charitable contribution of the scenic easement pursuant to section 170 for taxable year 1979. The next issue for consideration is the value of the scenic easement contributed by petitioners to Monterey County. The value of a charitable contribution of property other than money is, in general, the fair market value of the property *312 at the time of the contribution. Fair market value is defined as the price at which the property would change hands between a willing buyer and a willing seller, where neither party is under any compulsion to buy or sell and both parties have reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. Because open-space easements are granted by deed of gift, there is rarely an established market from which to derive fair market value. Symington v. Commissioner,87 T.C. 892 (1986). Both the courts and the Internal Revenue Service have approved the application of a "before and after" analysis to such property. Symington v. Commissioner,supra at 895; Stanley Works and Subsidiaries v. Commissioner,87 T.C. 389, 399 (1986); Rev. Rul. 73-339, 1973-2 C.B. 68, as clarified by Rev. Rul. 76-376, 1976-2 C.B. 53. [5] This analysis entails a comparison of the fair market value of the property before the conveyance of the easement with the fair market value of the property after it is encumbered by the easement, and any diminution of value is ascribed to the fair market value of the easement itself. *313 The fair market value of the property prior to the contribution of the easement is determined with respect to the highest and best use to which such property could be put on the date of valuation. Symington v. Commissioner,supra at 896; Stanley Works & Subsidiaries v. Commissioner,supra at 400. The valuation of the property is a question of fact to be determined on the basis of the entire record. Skripak v. Commissioner,84 T.C. 285, 320 (1985). Petitioners bear the burden of proof with respect to valuation. Rule 142(a); Welch v. Helvering,supra.
Both petitioners' expert and respondent's expert determined that the highest and best use for the property was subdivision and low density development of single family residences. Both experts employed the market data approach to valuation, and used comparable sales in determining the value of the subject property. Petitioners' expert additionally considered the possible development of the property in accordance with the Bestor plan as a check on his determination of the property's value. *314 Respondent's expert did not consider the possibility of subdivision, as described in the Bestor plan, or the possibility of 4 X 4ing. [6]
*315 The following sales were considered by both experts in reaching their conclusions as to the value of the Cachagua property: Lea
Clevenger
Size of
Price
Sale No.
Sale No.
Sale Date
Parcel
Per Acre
1
1
Jan. 1979
382 acres
$1,471.00
2
2
June 1976
249 acres
1,429.72
5
6
Aug. 1977
316 acres
712.00
6
7
May 1977
601 acres
499.00
Both experts considered sales No. 1 and 2 generally superior to the subject property. The per acre price of each of these sales was more than double the per acre value assigned to the subject property by Mr. Clevenger, and more than 4 times the per acre value assigned to the subject property by Mr. Lea. The report prepared by Mr. Clevenger indicates his estimations with regard to the various aspects of sales No. 1 and 2 which he considered superior to the subject property, and therefore provides support for his conclusion that the subject property was worth approximately 50 percent of the amount per acre of the amounts commanded in sales No. 1 and 2. While Mr. Lea considered these sales generally superior, his report does not offer any rationale for his conclusion that the subject property was worth approximately *316 25 percent of the value of these properties. Mr. Lea considered his sale No. 5, Mr. Clevenger's sale No. 6, generally superior to the subject property. His conclusion was apparently based on the parcel size of the property. He did not consider, however, that the size of the parcel in sale No. 5 was approximately the same size as a parcel petitioners could have sold had they divided the property through the minor subdivision process. While he noted that the date of sale No. 5, its location and its topography were inferior factors in determining its value, he considered this sale generally superior to the subject based on its parcel size. There is no evidence to support this conclusion. Mr. Lea's sale No. 6 (Mr. Clevenger's sale No. 7) was considered by both experts. Mr. Lea determined that this sale was superior to the subject property on an overall basis attributable to parcel size and utility availability, while Mr. Clevenger found it inferior on an overall basis, considering topography and potential development density. The time of this sale and its remote location are inferior factors with respect to value. While Mr. Lea determined that sale No. 6 had greater development *317 potential than the subject property, he conceded, on cross-examination, that sale No. 6 was no more capable of being divided into 40-acre parcels than the subject property. Further, Mr. Lea was unaware of resales from this property after minor subdivision, which he admitted should have been considered. In addition to the sales described above, Mr. Clevenger relied on resales from Mr. Clevenger's sale No. 7 which were not considered by Mr. Lea and on Clevenger's sale No. 23, in June 1979, in which 225 acres were sold for a price per acre of $2,000. Mr. Lea stated that had he been aware of this sale, six months prior to the valuation date of the property, he would have included it in his report and that while he would have considered it superior to the subject property based on the sale price per acre, he considered the property to be equivalent in location to the subject property. Mr. Lea considered three sales which were not considered by Mr. Clevenger in his appraisal. Mr. Lea's sale No. 7 took place in June, 1978, and was a sale of approximately 355 acres for $701 per acre. This parcel was approximately the same size as a parcel which could have been created by petitioners through *318 the use of the minor subdivision process. This property was not located in the Cachagua-Upper Carmel Valley planning area. In investigating this sale, Mr. Lea failed to note a 40-foot easement for high tension wires and poles, although the poles and wires were in place on the property. He was also unaware that this property had no access to a public road on the date it was sold or that a portion of the developable acreage on this property is inaccessible without obtaining an easement across neighboring property or building a bridge across a canyon. Mr. Lea's sale No. 8, in December of 1977, was a sale of 1,295 acres at a price per acre of $849. Mr. Lea considered this sale generally comparable to the subject property based on parcel size but inferior in time. However, he found that location, utility availability and topography were superior and therefore considered this sale superior on an overall basis. He failed to consider, however, that this property was located in the Carmel Valley planning area and was subject to a development moratorium. Finally, Mr. Lea considered the purchase of the subject property by petitioners in June, 1978, as a comparable sale in valuing the *319 subject property. He testified that he was unaware, however, that there had been a binding option on the property prior to the date it was purchased and that it was not an open market sale. After careful examination of each expert's report, it is apparent that Mr. Lea relied heavily on the data assembled by Mr. Clevenger in preparing his report. He did not consider potential development as a check on the market data approach, as did Mr. Clevenger. As noted above, Mr. Clevenger had extensive experience in appraising property in Monterey County, while Mr. Lea had virtually none. Mr. Lea spent only two days in Monterey County while appraising the entire 1,584 acres at issue herein, at which time he also conducted an appraisal of a tire manufacturing plant in Salinas. He did not personally inspect all of his comparable sales, and was unaware of certain easements with respect to high tension lines and the existence of other topographical features making development difficult. Despite his reliance on Mr. Clevenger's report, Mr. Lea concluded that the value of the property immediately prior to the contribution of the scenic easement was $475,000. We can find no explanation in the *320 record for the discrepancy between this value and the value assigned by petitioners' appraiser, $1,165,000. The Court has carefully considered the reports submitted by both experts, their testimony, and other testimony and exhibits in the record relating to valuation of the property. The Court also inspected the property at issue herein, accompanied by both petitioners' and respondent's counsel. Based on the entire record in this case, we find that the report of petitioners' expert is credible and accept his valuation of the property immediately prior to the contribution of the easement as $1,165,000 and his further determination that the value of the property immediately after the contribution of the scenic easement was $100,000. Petitioners are therefore allowed charitable contribution deductions in the amounts disallowed by respondent in his notices of deficiency. In addition to the report of respondent's expert, respondent advances several other arguments in support of his determination concerning the value of the scenic easement. Specifically, respondent contends that the 1978 purchase price provides the best indication of the property's value as of the date the easement *321 was conveyed. Respondent repeatedly asserts that $315,000 was the fair market value of the property at that time, relying on testimony by an agent of the seller. Respondent fails to note, however, that the agent stated that in his opinion the price was "fair," not that the property sold at fair market value, and that the property had never been listed for sale with any real estate broker. Respondent further alleges that the co-tenancy agreement among the owners of the Cachagua property discounts its value. Under this agreement, the owners agreed to preserve the property in its natural state but reserve the right to sell or divide the property upon the written agreement of a majority of the owners of the property. Respondent contends that because each owner owned an undivided, unpartitioned and unpartitionable 1/10th interest in the property, such interest might sell at a discount below its allocable portion of the value of the entire parcel. There is no evidence in the record which would support this claim, and neither expert found that the co-tenancy agreement would effect the value of the property. Further, in valuing the scenic easement contribution, we have considered the *322 value of the property as a whole rather than the price a potential purchaser of a 1/10th interest subject to the co-tenancy agreement would pay. Respondent also alleges that the possible expansion of the San Clemente Dam has an effect on the value of the property. As noted above, respondent has failed to recognize the minimal amount of property which would be taken if the dam were expanded, a fact which seemed unlikely as of the date of trial of this case. Respondent brought forth many witnesses and expended considerable time on brief arguing the potential difficulties which could arise in implementing the Bestor plan. Respondent discusses, at great length, problems with road access, road adequacy, fire hazards, lot size, lot density, septic tank placement, and the destruction of a scenic wilderness area. Despite potential difficulties in developing the property, the testimony of the appropriate county officials with such approval authority, produced at trial by petitioners, indicates that such a plan had a good chance of being approved in 1979. Conversely, none of the witnesses on whose testimony respondent relies in discussing possible difficulties had approval authority *323 for the property at that time. We also note that the Bestor plan was commissioned by petitioners in order to show the development potential of the property and was never intended to be implemented. The next issue for consideration is whether petitioners are liable for the increased rate of interest accruing after December 31, 1984, pursuant to section 6621(c). This provision provides for an increased rate of interest on deficiencies attributable to tax motivated transactions if the underpayment of tax is greater than or equal to $1,000 per year. Included in the definition of tax motivated transactions are transactions involving a valuation overstatement within the meaning of section 6659(c) of 150 percent or more. Sec. 6621(c)(3)(A)(i). In light of our finding that petitioners did not overvalue the property, petitioners are not liable for any increased rate of interest under section 6621(c). The final issue for consideration is whether the Court erred in excluding respondent's expert witness from the courtroom. At trial in this case, petitioners moved, pursuant to Tax Court Rule 145, to exclude witnesses during the testimony of petitioners' expert. The Court granted this *324 motion. Rule 145 provides that at the request of a party, the Court shall order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order on its own motion. This Rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause. This Rule, which as adopted in 1974, was revised in 1979 to be consistent with rule 615 of the Federal Rules of Evidence.71 T.C. 1206. The advisory committee notes to rule 615, Federal Rules of Evidence, indicate that the exclusion of witnesses is a matter of right, rather than a matter of the judge's discretion. Thus, absent a showing that the presence of respondent's witness was essential to the presentation of his cause, the Court was required to grant petitioners' motion. Respondent has the burden of making such a showing. Varlack v. SWC Caribbean, Inc.,550 F.2d 171, 175 (3d Cir. 1977). *325 At the time the motion was made, respondent contended that the presence of the expert witness was essential in assisting respondent to cross-examine petitioners' expert. On brief, respondent cites two cases in which the courts found that the presence of the expert was required. In Morvant v. Construction Aggregates Corp.,570 F.2d 626 (6th Cir. 1978), cert. dismissed Construction Aggregates Corp. v. Morvant,439 U.S. 801 (1978), the appellate court found that the trial court erred in excluding the plaintiff's expert. Respondent correctly points out that the circumstances of that case were complicated and the primary issue was very technical. Respondent further notes that the appellate court recognized that the decision to permit an expert witness to remain in the courtroom is within the discretion of the trial judge. As noted above, however, the Court is required to exclude a witness on motion of a party absent a showing from the other party that such witness is essential to his cause. At the time the witness in this case was excluded, respondent made no such showing. Respondent further relies on Oliver B. Cannon & Sons v. Fidelity & Casualty Co. of New York,519 F. Supp. 668 (D. Del. 1981). *326 In that case, the court noted that rule 615, Federal Rules of Evidence, is mandatory unless it is shown that the witness is essential to a party's presentation of his cause. 519 F. Supp. at 578. The court permitted the presence of experts where one expert intended to base his testimony and conclusions on evidence adduced at trial. The other expert whose presence was found to be essential to the party's case was an attorney who had handled an earlier case with respect to the same factual situation. The court noted that the advisory committee notes to rule 615, Federal Rules of Evidence, stated that the exception to the rule requiring exclusion of witnesses which permits a witness whose presence is essential to the presentation of a party's cause "contemplates such persons as an agent who handled the transaction being litigated." 519 F. Supp. at 679. That is not the situation in this case. Under Rule 143(f), the testimony of an expert witness is to be contained in the expert witness report. Further testimony is permitted only to clarify or emphasize matters in the report, to cover matters *327 arising after the preparation of the report, or otherwise at the discretion of the Court. The parties are required to furnish the expert witness reports no later than 15 days prior to the call of the trial calendar on which the case appears. Thus, petitioners' expert's testimony was confined to the matters discussed in his expert report. Respondent had the opportunity to review this report, with the assistance of his expert witness, prior to trial in this case. Further, respondent's expert played no part in the transaction at issue herein. Therefore, we find that respondent did not meet his burden of showing that his expert witness's presence was essential to the presentation of his cause. We find that there was no error in excluding respondent's expert witness from the courtroom. To reflect the foregoing, Decisions will be entered for the petitioners.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Bruce W. Hyman and Marcia E. Hyman, docket No. 27522-83; Douglas E. Chappell and Roberta Chappell, docket No. 31887-83; Charles R. Keller and Carol J. Keller, docket No. 31889-83; Joseph M. Tully, Jr. and Ruth E. Tully, docket No. 31909-83; Charles H. Page and Caroline R. Page, docket No. 31914-83; Theodore C. Hooker and Joan B. Hooker, docket No. 31985-83; Jay M. Hudson and Kip J. Hudson, docket No. 32016-83; Frederick M. Pownall and Susan S. Pownall, docket No. 32281-83; and Laurence P. Horan and Jean A. Horan, docket No. 32282-83.↩
a. Petitioner and his former wife claimed a carryover deduction to 1979 from 1977 for a charitable contribution made in 1977. They therefore claimed no deduction in 1979 for the contribution of capital gain property at issue in this case. The entire amount of the contribution was carried forward to later years. ↩
b. The parties have stipulated that petitioners Charles H. and Caroline R. Page are entitled to a residential energy credit of $1,073 from 1981, as claimed in their Form 1040X for that year.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years here in issue, and all Rules references refer to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. ↩
3. Subsec. (d) of sec. 6621 was designated subsec. (c) and amended by the Tax Reform Act of 1986, Pub.L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended.↩
4. Section 170(f)(3)(C) was repealed by section 6(a) of Pub.L. 96-541, 91 Stat. 3206, Dec. 17, 1980, effective for transfers made after December 17, 1980, in taxable years ending after such date. The definition of a qualified conservation contribution is now contained in section 170(h), which was added by section 6(b) of Pub.L. 96-541.↩
5. Fannon v. Commissioner,T.C. Memo. 1986-572↩.
6. In Akers v. Commissioner,T.C. Memo. 1984-490, we employed the before and after approach to valuing a charitable contribution of a scenic easement. In that case, we found that the valuation of the property by respondent's expert was reasonably based, in part, on the use of two comparable sales which were approximately the same size as the subject property in that case. Little weight was given to the testimony of the taxpayer's expert who considered, as comparable sales, the sales of smaller pieces of property. The taxpayer's expert had testified that these sales should be considered because the size of the parcels involved were similar to the size of the parcels into which the subject property in that case could have been subdivided. We found, however, that the record did not support the taxpayer's contention that the property could easily have been subdivided into such parcels. The Court of Appeals for the Sixth Circuit, affirming this decision, noted that the land adjacent to the property at issue in Akers required 16 years to be subdivided and sold. Akers v. Commissioner,799 F.2d 243↩ (6th Cir. 1986). In contrast, petitioners in this case could have subdivided the property into four parcels through the use of the minor subdivision process merely by filing a parcel map showing legal access to each of the four parcels. Further, the record supports petitioners' contention that, in 1979, a low density subdivision, similar to that proposed in the Bestor plan, would probably have received approval.